NOTICE

Decision filed 10/03/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230368-U

NOS. 5-23-0368, 5-23-0369, 5-23-0370,

5-23-0371, 5-23-0372 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* K.G., H.G., L.G., H.G., and O.G., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 22-JA-22, 22-JA-23, |
| v. | ) | 22-JA-24, 22-JA-25, and |
| | ) | 22-JA-51 |
| A.G., | ) | |
| | ) | Honorable Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court made explicit and sufficient oral findings during the adjudicatory hearing. The circuit court's findings in the adjudicatory and dispositional orders were not against the manifest weight of the evidence.

¶ 2    The respondent, A.G. (Mother), appeals the adjudicatory and dispositional orders entered by the circuit court of Marion County in the juvenile cases for her five children. Mother claims that the circuit court failed to make explicit and sufficient oral findings during the adjudication of neglect hearing and that the dispositional orders based on the adjudicatory orders should be vacated. Mother additionally claims that the circuit court's determinations were against the manifest weight of the evidence. For the following reasons, we affirm as modified.

1

¶ 3                                    I. BACKGROUND

¶ 4    The respondent, A.G. (Mother), is the biological mother and S.G. (Father) is the biological father of K.G., born June 7, 2016, H.G.1., born May 27, 2015, L.G., born October 5, 2020, H.G.2., born November 28, 2018, and O.G., born October 1, 2022.[1] The State brought separate juvenile cases for each of the five children in the circuit court of Marion County. The five cases were consolidated on appeal. Father is not a party to the appeal.

¶ 5    On April 12, 2022, the State filed petitions for adjudication for the four oldest children, and the circuit court held a shelter care hearing.[2] During the shelter care hearing, Bobbie Ball, the Department of Children and Family Services (DCFS) investigator, testified. Ball testified that when she was investigating the complaint, H.G.1. disclosed to Ball that Father would stick his finger into H.G.1.'s butt. H.G.1. referred to this as "wimpy whompy time." H.G.1. also disclosed that Father slept in a bed with H.G.1. and Father would "hump" her.

¶ 6    Ball testified that Mother told Ball that H.G.1. had urinary tract infections from "sticking the baby doll's foot in her vaginal area." Ball had advised Mother to take H.G.1. to the Amy Center, a facility that interviews children who have allegedly been sexually abused, physically abused, or are victims of trauma, for a forensic interview. Mother refused to cooperate and declined a safety plan. Because Mother refused to cooperate with the investigation, the children were taken into protective custody. DCFS was granted temporary custody and guardianship of the children.

¶ 7    After O.G.'s birth on October 1, 2022, he was taken into protective custody. The State filed a juvenile petition for O.G. claiming that O.G. was neglected based on the removal of his siblings

---

[1]The respondent's brief distinguished two of the minor children with the initials H.G. as H.G.1. and H.G.2. We also refer to H.G., born May 27, 2015, as H.G.1., and H.G., born November 28, 2018, as H.G.2.

[2]On this date, Mother was pregnant with her fifth child.

2

from his parents' care and the conditions had not been corrected, in violation of section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)). DCFS was granted temporary custody and guardianship of O.G. after a shelter care hearing.

¶ 8 After the filing of O.G.'s petition, the State filed amended petitions for adjudication of wardship for K.G., H.G.1., L.G., and H.G.2. The amended petitions alleged that the minors were in an environment injurious to their welfare and that Mother and Father failed to provide the proper education as required by state law in violation of sections 2-3(1)(a) and (b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a), (b) (West 2020)). Generally, the State alleged sexual abuse by Father to K.G. and H.G.1. The State additionally alleged that because K.G. and H.G.1. were harmed, their siblings were in an injurious environment, and there were allegations the children were not receiving a proper education. The five petitions were not identical as the paragraphs that described the allegations of abuse were specific to the individual child.

¶ 9 In *In re K.G.*, No. 22-JA-22 (Cir. Ct. Marion County), the State averred in paragraph three of the amended petition that K.G. was "neglected in that [K.G.'s] environment is injurious to his welfare, in that [K.G.] has alleged he does not feel safe at home and that [Father] hurts him and has sexually abused he and his siblings, causing his environment to be unsafe, in violation of 705 ILCS 405/2-3(1)(b) [(West 2020)]." Paragraph four of the amended petition averred that "[K.G.'s] environment is injurious to his welfare, in that [K.G.'s] sister has alleged that she does not feel safe at home and that [Father] 'humps' her and stuck his finger in her butt, causing his environment to be unsafe, in violation of 705 ILCS 405/2-3(1)(b) [(West 2020)]." The State additionally averred in paragraph five that K.G. was neglected because his parents did not provide the proper or necessary support, education, medical or necessary support, where K.G.'s parents were contacted

3

by the school with concerns, in violation of section 2-3(1)(a) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a) (West 2020)).

¶ 10    In *In re* H.G., No. 22-JA-23 (Cir. Ct. Marion County), the State averred in paragraph three of the amended petition that H.G.1. was "neglected in that [H.G.1.'s] environment is injurious to her welfare, in that said minor has alleged that she does not feel safe at home and that her father 'humps' her and stuck his finger in her butt," in violation of section 2-3(b) of the Juvenile Court Act (705 ILCS 405/2-3(b) (West 2020)). In paragraph four, the State averred that H.G.1.'s environment was injurious in that her brother alleged that he feels unsafe, and that Father hurt and had sexually abused him and their siblings, in violation of section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2020)). The State additionally averred the same allegation in paragraph five of K.G.'s petition as paragraph five in H.G.1.'s petition.

¶ 11    In paragraph three of the State's amended petitions for *In re* L.G., 22-JA-24 (Cir. Ct. Marion County), and *In re* H.G., 22-JA-25 (Cir. Ct. Marion County), the State claimed the children were neglected due to an injurious environment where their sister had alleged that she does not feel safe at home and that [Father] "humps" her and stuck his finger in her butt, in violation of section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2020)). Paragraph four of both amended petitions stated that the minors were neglected in that they were in an injurious environment where their brother alleged that he did not feel safe at home and Father hurts and sexually abused him and his siblings, in violation of section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2020)). Paragraph five of both amended petitions averred that their parents failed to provide proper or necessary support, education, or medical or other remedial care where their parents have failed to provide their siblings with proper assistance with school, in violation of section 2-3(1)(a) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a) (West 2020)).

4

¶ 12    The circuit court began the adjudicatory hearing on December 13, 2022. Bobbie Ball, the investigator with DCFS, testified. Ball was familiar with the oldest four children involved. During her investigation, K.G. had disclosed to Ball that he did not feel safe with Father. H.G.1. disclosed to Ball that she did not feel safe with Father because of "wimpy wampy time" and Father "humps" her.

¶ 13    Ball testified that when she interviewed Mother, she told Ball that H.G.1. had urinary tract infections and H.G.1. would "use a baby doll's feet and shove them in her vagina." Mother stopped allowing H.G.1. to play with her dolls because of H.G.1.'s behavior. Mother indicated that she believed that Donna Head, the children's maternal grandmother, coached the children to make allegations so Donna could gain custody. Unfounded allegations had been made by Donna in the past.

¶ 14    Ball testified that after the children were removed from their parents' care, each child received a wellness check. While K.G. was in the exam room with Ball, the doctor, and a nurse, K.G. stated that "my daddy bites my pee pee," and that he did not feel safe at home. H.G.1. also stated that she did not feel safe at home during her examination. Ball could not recall whether H.G.1. provided a reason as to why she felt unsafe. H.G.1. disclosed that Father hurt her private area and that Father caused her "butt to bleed."

¶ 15    Abigail Cowser-Barnett, the medical social associate with Children's Medical and Mental Health Resource Network, testified as an expert witness. Abigail met H.G.1. to perform a specialized medical examination. H.G.1. disclosed that "mommy whoops them." H.G.1. was initially excited when she met Abigail but became "very anxious" during her appointment. Abigail found H.G.1. to be "very agitated" and her "anxiety was extremely high." The doctor only completed a limited physical examination. When the doctor attempted to complete the genital

5

portion of the exam, "[H.G.1.] escalated very quickly with her anxiety and panic and a very fear-based response." The examination stopped when H.G.1. was not responsive to any attempts to calm her down.

¶ 16    Abigail testified that they have toys and "regulation tools" to help children feel comfortable in the examination room. H.G.1. had picked out a pink unicorn that she brought into the examination room with her. H.G.1. informed the doctor that someone had injured the unicorn and H.G.1. pointed "under the tail area of the backside of the unicorn." Abigail testified that when H.G.1. had pointed to the butt of the unicorn it raised a red flag as children do not typically identify injuries, "especially in the genital area on a toy or stuffed animal."

¶ 17    Kevin Cripps, a sheriff in Marion County, testified to investigating Mother and Father for allegations of sexual abuse. During Cripps' interview with Mother, she disclosed the children may have seen Mother and Father having sex. Mother also disclosed an incident where Father had injured H.G.1. during a game that the family played called "Uncle Ray Ray." Mother explained that to play "Uncle Ray Ray" a person would take two fingers and "poke" the buttocks area of the person that they are "Ray Ray'g." Mother said that the game was normally played over clothing, but there was a chance that it could have been played under clothing. Mother additionally informed Cripps that in late 2021 or early 2022, Father "Ray Ray'd" H.G.1.  and "he went past the rectum, all the way to the vaginal area, and actually caused injury to the vagina area." Father had caused H.G.1. to bleed and Mother considered using a sanitary pad for the blood. Cripps testified that he questioned Father about the "Uncle Ray Ray" game and Father admitted to playing the game but denied injuring a child.

¶ 18    Taryn Smith, the children's youth pastor, testified. At Donna Head's request, Taryn met with H.G.1. at the church on two occasions. Taryn testified that during their second meeting, H.G.1. told Taryn that "[Father] put his private part on her private part, and it hurt."

¶ 19    Beverly Cripps, Mother's aunt, testified that in early April of 2022, Donna Head had watched the children and H.G.1. did not want to return home. Donna Head asked Beverly to speak to H.G.1. Beverly spoke to H.G.1., who said that she was afraid of Father. Beverly asked H.G.1. how Father hurt her and H.G.1. pointed to her vagina. Beverly questioned H.G.1. on whether Father hurt her siblings. H.G.1. told Beverly that Father "bit" H.G.2. "on the penis." H.G.1. additionally told Beverly that Mother protected L.G.

¶ 20    Brittany Durre, the foster mother of K.G. and H.G.2., testified that she attended the same church as Donna. K.G. told Brittany that Father had "put his mouth on [K.G.'s] penis, penetrated [K.G.'s] butthole with his hands, his penis." K.G. also averred that Father had tied K.G.'s hands while Father was on top of K.G. and that Mother wanted K.G. to put his mouth on her "private body part."

¶ 21    Brittany testified to an instance where K.G. had randomly stated, "[Father] always spit on my butt." Brittany questioned K.G. and K.G. additionally said, "He always spit on my butt before he put his finger or his penis in it." Brittany additionally testified that K.G. placed a toy shark on his penis in the bathtub. Brittany questioned why he was doing that and K.G. responded, "Because it feels good. It feels good when a mouth is on my penis."

¶ 22    The adjudicatory hearing was continued to March 7, 2023. Kim Barbee-Tucker, the forensic interviewer with the Amy Center, testified. Kim had interviewed K.G. on April 25, 2022. During the interview, K.G. said that Mother was mean to him and K.G. mentioned H.G.1.'s "butt bleeding," but K.G. did not disclose details. Kim asked K.G. who he would tell if anyone tried to

hurt him. K.G. responded that he would tell a doctor. A video recording of the interview was admitted into evidence as Exhibit 1, without objection.

¶ 23 Kim conducted a second interview with K.G. on June 8, 2022, after K.G. had disclosed additional information to his foster mother. Kim testified that she was not aware of the new allegations prior to conducting the second interview. The second interview was admitted into evidence as Exhibit 2, without objection. During the second interview, K.G. stated that Mother and Father touched K.G.'s butt and it hurt, that Father "put his pee pee inside [K.G.'s] mouth," and that Father had touched H.G.1. and H.G.2.

¶ 24 Kim testified that she had conducted approximately 500 interviews. She tried to avoid interviewing a child several times. She explained that she had completed "quite a few" second interviews with children when additional disclosures were made by the children. It was common for a six-year-old child to disclose additional details over time.

¶ 25 Kim testified that she believed that K.G. was "very upfront." K.G. was "quick to correct [Kim]" and she "didn't sense him hiding anything." K.G. was full of energy and obtaining detail or keeping him in the interview room for a long period of time was "very hard." The State rested after Kim's testimony.

¶ 26 Mother testified, on her own behalf, and denied the allegations of abuse. Before the children were removed from Mother's care, Donna Head would watch the children on the weekends and take the children to church. Mother believed that Donna contacted DCFS because she wanted custody of H.G.1. Donna had called DCFS multiple times in the past and those investigations were unfounded. Mother also testified that the foster parents belonged to Donna's church.

¶ 27    The parties stipulated that H.G.2. was interviewed at the Amy Center, H.G.2. had not made disclosures of sexual abuse, and H.G.2. denied inappropriate touching. The parties additionally stipulated to admit H.G.1.'s interview with the Amy Center into evidence, without objection.

¶ 28    After closing arguments, the circuit court reviewed the evidence and testimony relevant to its findings. The circuit court stated that the State made several allegations and referred to paragraph five as the allegation regarding the children's failure to attend school. The circuit court found that the State had presented no evidence regarding the children's failure to attend school and denied that allegation in the petitions.

¶ 29    The circuit court identified two other allegations as neglect alleging sexual and physical abuse to H.G.1. and sexual and physical abuse to K.G. The circuit court stated that allegations regarding H.G.1. were in paragraph three and allegations regarding K.G. were in paragraph four. The circuit court did not state which petition it was referring to when referencing the paragraph numbers.

¶ 30    The circuit court found that the State had proven the allegations regarding K.G. in paragraph four of the petition by a preponderance of the evidence. The circuit court considered that K.G.'s testimony was inconsistent, and that he was a high energy five- or six-year-old at the time of the interview. The circuit court found that "[K.G.] unequivocally answered questions about his sister's butt bleeding and his dad hurting his pee pee." K.G.'s testimony about H.G.1. was corroborated by Mother. The circuit court found K.G. to be credible. The circuit court did not put much weight on the testimony by witnesses who were not trained to interview children.

¶ 31    The circuit court found "with regard to paragraph three and H.G.1" that there was some evidence of physical and sexual abuse. However, the State did not meet its burden of demonstrating

9

by a preponderance of the evidence the allegations involving H.G.1. because H.G.1. had indicated that nothing happened to her. The circuit court additionally stated,

> "Only one finding of neglect or abuse is necessary given that the Court will find that all children have been abused as that is alleged in the petition when one child has been abused or neglected. In this case neglected."

¶ 32    The written adjudicatory orders were entered on April 3, 2023, and written findings of fact were omitted. The circuit court found that the children were in an environment that was injurious to their welfare and that the abuse or neglect was inflicted by Father and the temporary custody order remained in effect.

¶ 33    The Court Appointed Special Advocates (CASA) filed a report on March 28, 2023. Mother had not received the DCFS service plan because Mother had not completed an integrated assessment (IA). CASA's recommendations included that DCFS continue to have custody and guardianship of the five children, Mother consistently communicate with the caseworker, and Mother complete an IA.

¶ 34    The dispositional reports were filed by the foster care manager on April 5, 2023. DCFS recommended that DCFS continue to have guardianship of the five children and that expedited termination of parental rights should be pursued. Visitation with Mother and Father was suspended due to the severity of the allegations. Mother contacted her caseworker for the first time on March 20, 2023, to discuss visitation and she was told to meet with her caseworker to discuss her service plan. Mother agreed to a service plan meeting. Father, however, ended the scheduling phone call after he told the caseworker that the allegations were not true, and that Mother and Father refused to participate in services.

¶ 35    The circuit court held the dispositional hearing on April 17, 2023. The circuit court indicated that it was considering both the dispositional report and the CASA report. The State did

10

not provide testimony or further evidence. Mother testified on her own behalf that she was concerned about the placement of her children with Donna, her mother, and Brittany, the foster mother. Mother believed that it was in the best interest of her children to return home, and she would do whatever was necessary to have her children returned.

¶ 36    The circuit court found that it was in the best interest for each of the five children for DCFS to have guardianship and custody and the children were made wards of the court. The circuit court found that it was clear that the children had suffered trauma through their words and behavior and found that both Mother and Father were unfit. Additionally, the circuit court stated that neither parent was willing to attend counseling or communicate with the caseworker. Mother and Father were admonished to cooperate with DCFS, comply with their service plans, correct the conditions that required the children to be in care, or they risked having their parental rights terminated. The formal written orders were entered on April 25, 2023. This appeal followed.

¶ 37                                   II. ANALYSIS

¶ 38    On appeal, Mother argues that the circuit court failed to make explicit and sufficient oral findings during the adjudication of neglect. Mother additionally argues that the circuit court's determination of neglect and the dispositional determinations were against the manifest weight of evidence.

¶ 39    The Juvenile Court Act (705 ILCS 405/1-1 *et seq*. (West 2022)) provides a two-step process to decide whether a minor should become a ward of the court. *In re A.P*., 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing on the petition of wardship. *In re A.P*., 2012 IL 113875, ¶ 19. "At the adjudicatory hearing, the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2022).

11

¶ 40    This case involves allegations that the children were neglected in that their environment was injurious to their welfare. The term "injurious environment" is recognized as an amorphous concept that cannot be defined but has been interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." (Internal quotation marks omitted.) *In re Arthur H*., 212 Ill. 2d 441, 463 (2004). Similarly, "neglect" has a fluid meaning, and "neglect" generally is defined as "the failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re Arthur H*., 212 Ill. 2d at 463.

¶ 41    The State must prove neglect, dependence, or abuse by a preponderance of the evidence. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). "Leaving a child in a sexually and physically abusive environment constitutes neglect in the environment." *In re Walter B.*, 227 Ill. App. 3d 746, 756 (1992). The neglect of one minor is admissible as evidence of neglect to other minors under the respondent's care. *In re Kenneth D*., 364 Ill. App. 3d 797, 801 (2006). There is no need to wait for a minor to be harmed before deciding that a child's environment is injurious. *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35.

¶ 42    Under section 2-21(1) of the Juvenile Court Act, "[t]he court's determination of whether the minor is abused, neglected, or dependent shall be stated in writing with the factual basis supporting that determination." 705 ILCS 405/2-21(1) (West 2022). However, "where an oral pronouncement is explicit and sufficient to advise the parties of the court's reasoning, the statutory requirement of a written explanation will be satisfied." *In re Leona W*., 228 Ill. 2d 439, 459 (2008). A circuit court order must be interpreted from the entire context in which it was entered and construed in a reasonable manner to give effect to the apparent intention of the circuit court. *In re Jennice L.*, 2021 IL App (1st) 200407, ¶ 18. A circuit court's finding of abuse or neglect will only

12

be reversed if it is against the manifest weight of the evidence. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 47.

¶ 43    If the circuit court determines that a minor has been abused, neglected or dependent, then the circuit court proceeds to the second step, the dispositional hearing. *In re A.P.*, 2012 IL 113875, ¶ 21. During the dispositional hearing, the circuit court determines whether it is consistent with the health, safety and best interests of the minors and the public for the minors to be made wards of the court. *In re A.P.*, 2012 IL 113875, ¶ 21. The circuit court additionally considers the permanency goal set for the minor at the dispositional hearing. 705 ILCS 405/2-22(1) (West 2022).

¶ 44    A circuit court's determination of wardship will be reversed if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 58. "This standard of review recognizes that the trial court is in a much better position than is this court to observe the witnesses, assess credibility, and weigh the evidence." *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 45    The petitions contained allegations that the children were neglected based on being in an environment injurious to their welfare under section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2022)). The specific paragraphs outlining the allegations in each petition were not identical. K.G.'s petition contained allegations in paragraph three that Father hurts him and Father sexually abused K.G. and his siblings. Similarly, H.G.1.'s petition contained an allegation that she was sexually abused by Father in paragraph three of her petition. Each of the five petitions contained allegations that the children were neglected in that his/her environment is injurious based on physical and sexual abuse to their siblings. Each of the four older children's petitions

13

additionally contained an allegation regarding education under section 2-3(1)(a) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a) (West 2022)), which the State did not prove by a preponderance of the evidence.

¶ 46　While written factual bases were omitted from the formal adjudicatory orders, the circuit court stated its reasoning for its determination during the adjudicatory hearing. Mother argues that the circuit court's oral findings were not explicit and were insufficient. The circuit court referenced paragraphs three and four of "the petition" without identifying the case number of the petition. Even though the allegations and paragraph numbers in each of the five petitions were not identical, the circuit court clearly identified the children's names when stating its reasoning. The circuit court found that "[K.G.] unequivocally answered questions about his sister's butt bleeding and his dad hurting his pee pee." The circuit court considered K.G.'s interview at the Amy Center, statements K.G. made to Bobbie Ball, as well as statements Mother made to Bobbie. The circuit court found K.G. to be credible and that K.G. was neglected.

¶ 47　In contrast, because H.G.1. denied the allegations during her interview, the circuit court found that the State failed to meet its burden of proof regarding allegations of abuse to H.G.1. Nevertheless, H.G.1.'s petition was granted because it contained an allegation that she was neglected for being in an injurious environment based on the circuit court's finding that K.G. was neglected. The petitions for H.G.2., L.G., and O.G. were also granted based on the harm to their sibling, K.G. When considering the entire context of the circuit court's findings without relying on the reference to a paragraph number, the circuit court's statements were explicit and sufficient to advise the parties of the court's reasoning.

14

¶ 48    Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994),

we hereby amend the circuit court's adjudicatory orders to reflect the circuit court's oral findings.

*In re* K.G., No. 22-JA-22 (Cir. Ct. Marion County), is amended as follows:

> g. The State has proved allegations in paragraph three of its petition by a preponderance of the evidence. K.G. is neglected in that his environment is injurious to his welfare where his father physically and sexually abused K.G. Specifically, K.G.'s testimony of "his dad hurting his pee pee" was found credible.

*In re* H.G., No. 22-JA-23 (Cir. Ct. Marion County), *In re* L.G., No. 22-JA-24 (Cir. Ct. Marion County), and *In re* H.G., No. 22-JA-25 (Cir. Ct. Marion County), are amended as follows:

> g. The State has proved allegations in paragraph four of its petition by a preponderance of the evidence. Specifically, K.G.'s testimony of "his dad hurting his pee pee" was found credible and K.G. was found neglected. H.G.1., L.G., H.G.2., and O.G. are found to be neglected where the minors' brother was physically and sexually abused by their father, causing their environment to be unsafe.

*In re* O.G., No. 22-JA-51 (Cir. Ct. Marion County), is amended as follows:

> g. The State has proved allegations in paragraph three of its petition by a preponderance of the evidence. The minor is found to be neglected in that said minor's brother was physically and sexually abused by his father causing O.G.'s environment to be unsafe. Specifically, K.G.'s testimony of "his dad hurting his pee pee" was found credible and K.G. was found neglected. The minor's siblings are wards of the court and the conditions that led to their removal have not been corrected.

¶ 49    As explained above, on review, this court will not reweigh the evidence or reassess the

credibility of the witnesses. The circuit court was in the best position to make a credibility

assessment of witness testimony and weigh the evidence. We have thoroughly reviewed the record

on appeal and conclude that the circuit court's adjudicatory and dispositional determinations were

not against the manifest weight of the evidence.

¶ 50                                III. CONCLUSION

¶ 51    For the foregoing reasons, the adjudicatory and dispositional determinations of the circuit

court of Marion County, as to each of the five children, are affirmed as modified.

15

¶ 52    Affirmed as modified.