NOTICE

Decision filed 09/24/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250353-U

NOS. 5-25-0353, 5-25-0354, 5-25-0355, 5-25-0356, 5-25-0357 cons.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* KAIDEN G., HAYLEE G., LYDIA G., HENRY G., and OLIVER G., Minors | ) ) ) | Appeal from the Circuit Court of Marion County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 22-JA-22, 22-JA-23, 22-JA-24, 22-JA-25, 22-JA-51 |
| Anna G., | ) ) | |
| | ) ) | Honorable Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney and Justice Boie concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's findings of facts were sufficient to allow meaningful appellate review and the circuit court's finding that the respondent mother was unfit was not against the manifest weight of the evidence.

¶ 2   The respondent, Anna G. (Mother), appeals an order of the circuit court terminating her parental rights to her five children.[1] She argues that (1) the circuit court erred in failing to make findings of fact that were adequate to allow meaningful appellate review; and (2) the circuit court's

---

[1]Mother filed separate appeals in each of her five children's cases (case Nos. 5-25-0353, 5-25-0354, 5-25-0355, 5-25-0356, and 5-25-0357). This court has consolidated those appeals under the case number assigned to Kaiden's case (5-25-0353).

finding of unfitness was against the manifest weight of the evidence. We affirm the judgment of the circuit court.[2]

¶ 3                                    I. BACKGROUND

¶ 4      On April 12, 2022, the State filed petitions for adjudication of wardship and motions for temporary custody as to Mother's four oldest children, Haylee (born May 27, 2015), Kaiden (born June 7, 2016), Henry (born November 28, 2018), and Lydia (born October 5, 2020). The petitions named both Mother and her husband, Shawn G. (Father), as respondents.[3] The State alleged that the children were neglected due to an environment injurious to their welfare because (1) Kaiden alleged that Father "bites [his] pee pee"; (2) Haylee alleged that Father "humps" her; (3) Mother and Father failed to obtain medical treatment for Haylee, who suffered frequent urinary tract infections, allegedly caused by placing toys in her genitals; and (4) Mother and Father failed to arrange school assistance for Kaiden despite being contacted by his school with concerns.

¶ 5      The circuit court held a shelter care hearing the same day. After the hearing, the circuit court entered orders for temporary custody, finding, *inter alia*, that Mother and Father "refused to cooperate with a safety plan and/or intact services."

¶ 6      Mother and Father's youngest child, Oliver, was born on October 1, 2022. Two days later, the State filed a petition for adjudication of wardship and a motion for temporary custody. The petition alleged that Oliver was neglected due to an environment injurious to his welfare because his four siblings were wards of the court and the conditions leading to their removal had not been

---

[2]This cause involves an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under Rule 311(a)(5), the appellate court is required to issue a decision within 150 days after the filing of a notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Our decision in this case was due on or before September 22, 2025. However, this appeal involved the consolidation of five cases concerning the termination of the mother's parental rights as to five children. In addition, both the appellant and the appellee requested extensions of time to file their initial briefs. Under these circumstances, we find that good cause exists to issue our disposition outside the 150-day deadline.

[3]Father is not a party to this appeal and has filed a separate appeal.

corrected. After a shelter care hearing that day, the circuit court entered an order for temporary custody finding that Mother and Father had not complied with the Department of Children and Family Services (DCFS) service plans relating to their four older children.

¶ 7    On October 11, 2022, the State filed amended petitions for adjudication of wardship. The State alleged that the children were neglected due to an injurious environment because (1) both Kaiden and Haylee alleged they did not feel safe at home, (2) Kaiden alleged that Father hurts him and sexually abuses him and his siblings, and (3) Haylee alleged that Father "humped" her and stuck his finger in her butt.

¶ 8    The adjudicatory hearing took place over two days on December 13, 2022, and March 7, 2023. At the end of the hearing, the circuit court found the children to be neglected. On April 3, 2023, the circuit court entered written adjudicatory orders finding the children to be neglected due to an environment injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2022)). The dispositional hearing occurred on April 17, 2023. At the end of the hearing, the circuit court found that it was in the children's best interests to be in the care and custody of DCFS and the children were made wards of the court. The circuit court noted that both parents refused to attend counseling sessions or communicate with their caseworker. The circuit court entered dispositional orders making the children wards of the court on April 25, 2023.[4]

¶ 9    In September 2023, Mother and Father's caseworker arranged for supervised visitation with the children after the parents began engaging with services. On November 27, 2023, the circuit court ordered that Mother and Father were to have no further contact with the three oldest children, Haylee, Kaiden, and Henry. In a docket entry, the circuit court stated that these children

---

[4]Mother appealed the circuit court's order of April 25, 2023. This court affirmed the circuit court's order. *In re K.G.*, 2023 IL App (5th) 230368-U.

3

had "extreme trauma responses" to a visit with their parents and that during the visit, Father threatened to "whoop" one of the children. The circuit court further noted that the agency arranged the visits without first consulting with the children's counselors.

¶ 10    In a May 22, 2024, docket entry, the circuit court suspended Mother and Father's visits with the two youngest children, Lydia and Oliver. The court explained that its ruling was due to the children's "clear traumatic responses" following visits.

¶ 11    On December 16, 2024, the State filed petitions to terminate both parents' parental rights to all five children. The petition alleged that both Mother and Father were unfit on two statutory grounds: (1) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(i) (West 2024)), and (2) failure to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(ii) (West 2024)). The State identified three nine-month periods for both failure to make reasonable efforts and failure to make reasonable progress: (1) March 8, 2023, to December 8, 2023; (2) December 9, 2023, to September 9, 2024; and (3) March 15, 2024, to December 15, 2024.

¶ 12    The circuit court held a hearing on the petition on February 12, 2025. At the outset, the assistant state's attorney informed the circuit court that the State intended to present evidence concerning only the latter two of the nine-month periods identified in the petition to terminate (December 9, 2023, to September 9, 2024, and March 15, 2024, to December 15, 2024).

¶ 13    The State's primary witness was Dollie Vogler, who worked for Caritas Family Solutions, a contract agency for DCFS. Vogler served as the family's caseworker from December 2023 to November 2024, when she left Caritas. Vogler testified that the first steps she took upon receiving the case were to conduct an integrated assessment of both Mother and Father and refer them for

4

parenting capacity assessments and psychological evaluations. She indicated Father did not complete his psychological evaluation.

¶ 14   Vogler identified two service plans she had developed for the family, dated July 22, 2024, and October 1, 2024, which were entered into evidence as Exhibits 3 and 4, respectively. She explained that ordinarily, she developed a new service plan every six months. In this case, however, she created an updated plan in July 2024, to include the recommendations from the psychosexual evaluation that took place in May 2024. Vogler testified that she created a service plan for the family in April 2024 as well; however, that plan was not entered into evidence and Vogler did not testify regarding its contents. Vogler was asked about the evaluations of the parents' progress that appear in the service plans. She explained that the evaluations involve ratings of their progress over the previous six months.

¶ 15   Vogler explained that her usual practice was to meet with parents to review their service plans. After this review, she usually asks the parents to sign the service plan. Vogler acknowledged that this did not occur for the July 2024 and October 2024 service plans. She explained that as of the date she developed these two plans, she did not have personal contact with Mother or Father, as visits with the children had ended in May 2024, and it was at these visits where Vogler could meet with the parents. The only time Vogler met with Mother or Father to discuss their service plan was when she was first assigned the case, and that would have been in regard to a prior service plan.

¶ 16   Vogler testified at length concerning the limits to her in-person contact with Mother and Father and the reasons for those limits. She stated that Father verbally threatened her and other social service workers via text messages. Vogler explained that, because of these threats, she and other agency employees only saw Mother and Father during their supervised visits with the

5

children. Vogler noted that she was able to review their service plans with them at these meetings. However, she had no in-person contact with them after visits with the youngest children stopped in May 2024. Instead, Vogler attempted to communicate with Mother and Father through email and text messages, but they did not respond. Vogler acknowledged that in July 2024, she changed her phone number and did not immediately provide the new number to Mother and Father. This happened after she received "very mean" messages from Father. She was not asked to clarify this testimony. Vogler testified that her supervisor decided that all communications with Mother and Father would be by email, and their attorneys would be included in the email chain. Eventually, Vogler provided Mother and Father with her new phone number.

¶ 17    Vogler testified that she sent copies of the July 2024 service plan to Mother and Father and their attorneys by email. She discussed the plan with Mother by telephone on July 26, 2024. Vogler could not recall whether she sent copies of the October 2024 service plan by email, but she knew Mother and Father received a copy because they sent her a photograph of it. She explained that she had mailed a copy of the service plan and, although it went to the wrong address, they received it because it was "the brother's house."

¶ 18    Vogler testified that the services recommended for Mother in both the July 2024 and October 2024 service plans included parenting classes, maintaining stable income and housing, and completing various evaluations. While Mother satisfactorily completed some of these services, she did not complete all of the recommended services. Vogler noted that Mother completed the parenting capacity assessment and the psychological evaluation, but she did not participate in therapy with a licensed sexual abuse counselor. Vogler further testified that she attempted to obtain signed consent forms from Mother that would have allowed her to request records from providers, but Mother never responded. Vogler also explained that Mother was rated as unsatisfactory in

maintaining stable income and housing because she refused to provide proof of her income and did not cooperate in allowing a home safety check. Vogler testified that the agency had asked for an investigator to go to the house, and the investigator was not allowed entry.

¶ 19    Vogler's supervisor, Krystal Foley, also testified for the State. When Vogler left her position in November 2024, Foley briefly acted as the family's caseworker from November 15, 2024, to January 6, 2025. When asked if Mother made any progress on her service plan during this period, Foley replied, "Not to my knowledge, no." On cross-examination, she acknowledged that she did not speak with any of Mother's service providers during the few weeks she served as the caseworker. She testified, however, that in her capacity as supervisor, she spoke with Mother's mental health counselor later in January 2025.

¶ 20    Amber Thompson, a mental health counselor, testified on behalf of Mother. Thompson began counseling with Mother in May 2024. The goals of her treatment were adjusting to the circumstances of not having her children living with her and participating in group parenting classes. According to Thompson, Mother seemed to be engaged during counseling sessions and was successful in meeting the goals of her treatment. She completed the program and was discharged from services on February 5, 2025. Mother did not testify.

¶ 21    Exhibit 3, the July 2024 service plan, included specific goals for Mother to accomplish along with ratings of her progress toward achieving those goals. The first five goals were established in May 2022 and involved assessments that were not completed until 2024. The ratings for Mother's progress on each of these five goals reflected evaluations in April 2024. The first goal was to participate in an integrated assessment and follow through with all recommendations. Vogler rated Mother's progress on this goal as satisfactory, noting that she completed the assessment on January 8, 2024. The second goal for Mother was participation in a parenting

capacity assessment. Vogler rated Mother as satisfactory for participating in the assessment in February 2024. The third goal was to participate in a psychological evaluation and follow all recommendations. Vogler rated Mother as satisfactory for completing the psychological evaluation on March 6, 2024. Mother's fourth goal was to participate in a mental health assessment and follow all recommendations. Mother participated in the assessment on March 7, 2024, and Vogler therefore rated her progress as satisfactory for this goal as well. The fifth goal was to participate in a substance abuse assessment and follow all recommendations. Vogler noted that Mother completed the assessment in August 2023, the assessor made no recommendations, and Mother tested negative in a drug test. Mother's progress was satisfactory, and Vogler recommended discontinuing services.

¶ 22    The remaining goals were established for Mother after May 2022. The sixth goal, added in October 2023, was to engage and learn effective parenting skills by taking parenting classes. Vogler rated Mother's progress toward this goal as unsatisfactory on April 1, 2024, noting that Mother had not begun attending parenting classes even though Vogler had provided her with a referral. In an April 4, 2024, evaluation, Vogler likewise rated Mother's progress as unsatisfactory toward her seventh goal, maintaining stable income and housing. This goal was added in April 2024. Vogler noted that to satisfy this goal, Mother was required to provide proof of her income and allow a home safety check.

¶ 23    The eighth and ninth goals for Mother were added in April 2024 and involved recommendations from the psychological assessment. She was to participate in a psychiatric evaluation and a non-offender assessment and follow all recommendations. Vogler rated Mother's progress on both goals as unsatisfactory as of April 4, 2024, noting that she had not even completed the assessments.

8

¶ 24    The final goal for Mother was to follow the recommendations from the psychosexual assessment performed in May 2024. Those recommendations included engaging in counseling with a licensed sex offender treatment provider. Vogler rated Mother's progress as unsatisfactory, as Mother had not followed through with this recommendation.

¶ 25    Exhibit 4, the October 1, 2024, service plan, included the same 10 goals for Mother along with evaluations of her progress toward those goals over the preceding six months. This time, Vogler rated Mother's progress on the first three goals (the integrated assessment, parenting capacity assessment, and psychological assessment) as unsatisfactory. She noted that although Mother completed the assessments themselves, she had not followed any of the recommendations.

¶ 26    Vogler rated Mother's progress related to the mental health assessment as satisfactory, noting that Mother participated in recommended biweekly services. She likewise rated Mother's progress related to the substance abuse evaluation as satisfactory for the same reasons outlined in the July service plan. Vogler rated Mother's progress as satisfactory toward her goal of completing parenting classes, noting that she began attending the classes in August 2024.

¶ 27    Vogler rated Mother as unsatisfactory on all four of her remaining goals. She once again noted that Mother was to provide proof of her income and allow a home safety check to satisfy the goal of maintaining stable income and housing. Vogler further indicated that although Mother completed the non-offender assessment, she had not followed the assessor's recommendations, and she had not engaged in any services related to the goals of obtaining a psychiatric assessment and participating in counseling with a licensed sex offender treatment provider.

¶ 28    At the conclusion of argument, in ruling from the bench, the circuit court found that Mother "engaged in services and clearly attempted to cooperate and make reasonable efforts." The court noted that Mother engaged in mental health counseling but did not complete the program until

9

after the end of the latest nine-month period at issue. The court found no evidence that Mother had been verbally abusive to the caseworkers, but further found that she did not communicate with them consistently or provide the signed consent forms that would have allowed the caseworker to verify that she was participating in recommended services. The circuit court found that Mother's most significant failures were "her failure to acknowledge that the children were abused" and her "failure to make any behavior change reducing the risk of harm to these kids." In conclusion, the court found that the State had met its burden of finding Mother unfit. The circuit court made similar findings with respect to Father.

¶ 29    The circuit court held a best interest hearing on April 2, 2025, at which it heard testimony from the children's foster parents, Krystal Foley, and Mother. Because Mother challenges only the circuit court's finding of unfitness, we defer any discussion of this testimony.

¶ 30    At the conclusion of the best interest hearing, the circuit court took matters under advisement. A written order terminating Mother and Father's parental rights was entered on April 23, 2025. Although the circuit court's written findings focused primarily on the evidence presented at the best interest hearing, the circuit court stated as follows: "As the Court found in the fitness phase of this proceeding, [Mother and Father] do not acknowledge that their children were abused or neglected. They do not acknowledge that their children experience symptoms and behaviors related to trauma. [Mother] lacks the ability to protect them and help them heal." In addition, the circuit court found that all of the children's foster families provide for their physical and emotional needs and that all of the children feel safe in their foster homes. The circuit court concluded that termination of parental rights was in the children's best interests. Mother filed a timely notice of appeal.

10

¶ 31                          II. ANALYSIS

¶ 32    Mother argues that (1) the circuit court's findings were insufficiently specific to allow for meaningful appellate review, thus requiring remand for more detailed factual findings; and (2) the circuit court's finding of unfitness was against the manifest weight of the evidence. We reject both contentions.

¶ 33                    A. Applicable Law and Standard of Review

¶ 34    Termination of parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. This heightened standard is necessary because the termination of parental rights results in "a permanent and complete severance of the parent-child relationship" (*In re C.N.*, 196 Ill. 2d 181, 208 (2001)), thereby curtailing a fundamental liberty interest (see *In re C.N.*, 196 Ill. 2d at 216). If the circuit court finds a parent unfit, the proceedings move to the second step, at which the State must prove by a preponderance of the evidence that termination is in the children's best interests. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 73.

¶ 35    A parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63; see also 750 ILCS 50/1(D) (West 2024) (providing that, "The grounds for unfitness are *any one or more* of the following" (emphasis added)). As such, we may affirm the circuit court's decision if the evidence supports its finding of unfitness on any one of the grounds alleged. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 64.

¶ 36    We give great deference to the circuit court's decision because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will not reverse the circuit court's finding of unfitness unless

11

it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A finding of unfitness is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from our review of the record. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. With these principles in mind, we turn our attention to Mother's contentions.

¶ 37                              B. Adequacy of the Circuit Court's Findings

¶ 38    We will first consider Mother's argument concerning the adequacy of the circuit court's factual findings. The circuit court found that the State met its burden of proving Mother unfit, but did not specify which statutory ground or grounds it found the State had proven, nor did the court specify which of the nine-month periods that had been alleged. Mother argues that, as such, the circuit court's findings were inadequate to permit meaningful appellate review of its decision and that we must remand for more specific findings. We disagree.

¶ 39    In support of her contention, Mother likens this case to *In re B'yata I.*, 2013 IL App (2d) 130558, a case in which the appellate court remanded the matter to the circuit court after concluding that a lack of specificity in the circuit court's finding of unfitness precluded meaningful appellate review. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 41. We find that case distinguishable.

¶ 40    There, the State filed a petition to terminate the respondent mother's parental rights alleging four different grounds for unfitness. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 12. In both its oral findings and its written order, the circuit court simply stated that the State met its burden of proof with respect to three counts of the petition to terminate. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 34. On appeal, the mother argued that the circuit court erred by failing to make any written or oral findings of fact in support of this determination. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 27.

¶ 41     Before addressing this contention, the appellate court noted that, although there is no statutory requirement that a circuit court put the factual basis for its finding of unfitness in writing, a lack of specific factual findings can make meaningful appellate review difficult. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 32 (citing *In re G.W.*, 357 Ill. App. 3d 1058, 1061 (2005)). The court emphasized, however, that the lack of specific findings does not require reversal in every case, particularly where the evidence of unfitness is undisputed and overwhelming. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 33 (citing *In re Richard H.*, 376 Ill. App. 3d 162, 164-66 (2007)). The appellate court next considered the evidence of each of the three grounds for unfitness found to exist by the circuit court. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶¶ 35-40. Ultimately, the court concluded that because the evidence as to each ground was neither undisputed nor overwhelming, the complete lack of a factual basis provided by the circuit court precluded meaningful appellate review of the circuit court's decision. *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 41.

¶ 42     Here, by contrast, the circuit court did make specific factual findings concerning Mother's efforts to correct the conditions that led to the children's removal and her progress towards their return. As discussed earlier, the circuit court found that she attempted to comply with the requirements of her service plans and to make reasonable efforts, but she was unwilling to consistently communicate with her caseworker or to provide signed consent forms that would have allowed the caseworker to monitor her progress. In addition, the circuit court found that Mother failed to acknowledge that the children had been abused or to make any changes that would protect them from harm in the future and "had chosen [Father] over her children." These findings are adequate to allow this court to conduct a meaningful review to determine whether they are

13

supported by the evidence. See *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 48 (distinguishing *In re B'yata I.* on this basis); *In re A.H.*, 2024 IL App (4th) 240864-U, ¶ 25 (same).[5]

¶ 43 We note, however, that although the circuit court made specific factual findings concerning both Mother's efforts to correct the conditions that led to the children's removal from her home and the ways in which those efforts fell short, it is not entirely clear whether the circuit court ultimately concluded that Mother's efforts were reasonable or not. Thus, it is unclear whether the circuit court found her unfit based solely on her failure to make reasonable progress towards the children's return or on both of the grounds asserted by the State.[6] Nevertheless, because the State is only required to prove one statutory ground for unfitness, we need only consider whether the evidence was sufficient to support the circuit court's finding of unfitness based upon the allegation that Mother failed to make reasonable progress towards the return of her children. See *In re A.H.*, 2024 IL App (4th) 240864-U, ¶ 27. As we have already explained, the circuit court's factual findings concerning Mother's lack of progress were adequate to allow meaningful review and the evidence was sufficient to support those findings. We therefore reject Mother's contention that we must remand this matter for further findings of fact and find that there was sufficient specificity in the circuit court's findings to allow for meaningful appellate court review.

¶ 44                    C. Manifest Weight of the Evidence

¶ 45 Here, as previously noted, the State alleged two different grounds for unfitness: failure to make reasonable efforts to correct the conditions that led to the children's removal during any

---

[5]Although this is an unpublished decision, we cite it as persuasive authority, as allowed under Illinois Supreme Court Rule 23(e)(1) (eff. Jan. 1, 2021) (providing that a nonprecedential order entered under Rule 23(b) after January 1, 2021, "may be cited for persuasive purposes").

[6]We note that in a recent unpublished decision involving similar circumstances, the Fourth District presumed that the circuit court found the respondent mother unfit on all grounds asserted by the State, explaining that this was "the only reasonable interpretation" of its order. See *In re A.H.*, 2024 IL App (4th) 240864, ¶ 27.

nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(i) (West 2024)) and failure to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect or abuse (750 ILCS 50/1(D)(m)(ii) (West 2024)). The nine-month periods at issue for both reasonable efforts and reasonable progress were December 9, 2023, to September 9, 2024, and March 15, 2024, to December 15, 2024.

¶ 46    Failure to make reasonable efforts and failure to make reasonable progress are two distinct grounds for parental unfitness. *In re Daphnie E.*, 368 Ill. App. 3d at 1066. We assess a parent's reasonable efforts by a subjective standard based on the amount of effort that is reasonable for the particular parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1066-67. By contrast, we measure reasonable progress by an objective standard. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. A parent has made reasonable progress toward the return of the child when the circuit court, "in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 47    Mother's claim that the circuit court's findings were against the manifest weight of the evidence has four components. She contends that (1) the testimony of the State's principle witness, Vogler, was "vague" and "contradictory"; (2) the State did not offer into evidence "the psychosexual evaluation reports related to the most important issue in the case"; (3) the State presented no evidence concerning Mother's progress during portions of both nine-month periods

identified in the petition to terminate;[7] and (4) during the pertinent periods, Vogler and Foley provided Mother with virtually no service or assistance. We reject each of these contentions.

¶ 48    First, to the extent Mother argues that Vogler's testimony should be rejected because it was allegedly vague or contradictory, we emphasize that the circuit court is in the best position to make credibility determinations. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 57. And we will not reject those determinations unless they are against the manifest weight of the evidence. In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The circuit court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. We find that Mother's allegations are unfounded based upon our review of the record.

¶ 49    We likewise reject Mother's contention that reports from the psychosexual assessment performed in January 2024 and the psychosexual evaluation performed in May 2024 were necessary to support the circuit court's decision. The reports themselves were not essential to the findings of unfitness where the service plans—which included the evaluators' recommendations—

---

[7]Mother makes the same argument with respect to the evidence of her lack of reasonable efforts. Both parties assert that the evidence of reasonable efforts and reasonable progress in this case was essentially the same evidence. As explained earlier, however, we need only consider whether the evidence supported either the circuit court's finding that Mother failed to make reasonable progress toward the children's return or that mother failed to make reasonable efforts toward the return of the children.

16

were admitted into evidence. The circuit court was thus advised of the need for these evaluations and was able to evaluate Mother's progress in following those recommendations.

¶ 50     Moreover, the central issue in this case was whether Mother was willing and able to protect the children from the abuse by Father that led to their removal. The evidence presented allowed the circuit court to address that question. In that regard, we find the Fourth District's decision in *In re Ta. T.* instructive. There, the respondent father engaged in all required services and fully complied with his service plan. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 54. His caseworker testified that she was planning to return the children to his custody, but she discovered that he was charged with delivery of methamphetamine and was involved in at least one incident involving domestic violence against his girlfriend. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 54. This information led her to conclude that despite the father's completion of the required services, he "was not behaving any differently than when the children came into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 54. Under these circumstances, the circuit court found that the father failed to make reasonable progress toward the return of his children. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 57.

¶ 51     In affirming the circuit court's decision, the Fourth District explained that the purpose of requiring parents to engage in services is so they can apply what they learn from those services to their lives "such that the court can be confident that the children will be safe in their care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. The Fourth District emphasized that despite completing all required services, the father's "behavior was unchanged since the children had come into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 57. As such, the appellate court explained, "his progress was not demonstrable or of such a quality that (1) the conditions that brought the children into care

17

had been corrected and (2) the children could be returned home safely." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56.

¶ 52    Here, similarly, the overwhelming evidence demonstrated that Mother's behavior had not changed, and she was no more willing or able to protect the children from abuse than she had been when they were taken into care. Vogler noted Mother's unwillingness to acknowledge that the abuse occurred or to recognize the trauma responses of the children both in her evaluations of Mother's progress in the service plans and in her testimony. Significantly, due in large part to these deficits, Mother was not allowed to have even supervised visitation with any of her children at the time the unfitness hearing occurred, thereby making it extremely unlikely the children could be returned to her care anytime soon. See *In re Ka. F.*, 2023 IL App (4th) 230496-U, ¶ 39 (upholding a finding that a father failed to make reasonable progress where he "never progressed to unsupervised visits and his ability to have the children in his custody in the near future was highly questionable"). Under these circumstances, we cannot find that the introduction of these reports was necessary to support the circuit court's finding of unfitness.

¶ 53    Mother next argues that the State did not present any evidence concerning her progress during two key periods: December 9, 2023, to January 22, 2024, and November 15, 2024, to December 15, 2024. We are not persuaded.

¶ 54    Mother contends that there was no evidence with respect to the period between December 9, 2023, and January 22, 2024, because the State did not introduce into evidence the service plan from April 1, 2024. As she explains, each service plan contained an evaluation of her progress over the six preceding months. She therefore contends that without evidence of the evaluations contained in the April 2024 service plan, there was no evidence concerning her progress prior to that date (although we note that Mother apparently acknowledges that Vogler's testimony provided

18

evidence of her progress after January 22, 2024). As we explained earlier, however, the July 2024 service plan included evaluations performed in April 2024. Moreover, Vogler's testimony adequately covered this period.

¶ 55    Mother likewise contends that the State presented no evidence concerning her progress between November 15, 2024, when Vogler left her position, and December 15, 2024, the end of the second nine-month period at issue. Mother acknowledges that this period is covered by Foley's testimony. She contends, however, that Foley's testimony was not based on her personal knowledge of the case. Mother points to Foley's testimony that she did not speak with any of Mother's service providers during her brief tenure as caseworker and her statement that, "to [her] knowledge," Mother made no progress during this period. Mother's argument places too much emphasis on Foley's use of the phrase "not to my knowledge." She also overlooks Foley's testimony that she did speak with Mother's mental health counselor later in January in her capacity as supervisor.

¶ 56    Nevertheless, even assuming Foley's testimony was not sufficient to support the circuit court's findings, we have already concluded that the State presented sufficient evidence covering the entire period from December 9, 2023, through September 9, 2024. Because a parent may be found to be unfit for failure to make reasonable progress toward the return of the children during *any* nine-month period following an adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)), the circuit court's finding is supported by the evidence even if we discount Foley's testimony. We therefore reject Mother's contention that the State did not present evidence covering the entirety of any nine-month period.

¶ 57    Finally, Mother argues that the circuit court's finding is against the manifest weight of the evidence because Vogler failed to provide her with adequate services during the relevant period.

19

In support of this argument, Mother challenges Vogler's testimony concerning Father's threats and the agency's resultant decision to have caseworkers avoid in-person contact. She argues that Vogler had no direct personal knowledge of the threats. She further emphasizes that the threats came from Father, not Mother. We find these arguments unavailing.

¶ 58    We first note that Father's threats to social service workers prompted the agency to stop sending investigators, caseworkers, and other employees to Mother's home before Vogler was assigned to the case. The fact that Vogler had no direct knowledge of the threats Father made to other employees does not undermine the evidence that someone at the agency made that decision because of the threats. Moreover, there was ample evidence that Vogler received "mean messages" from Father, which Mother took no offense toward, as Mother did not reach out to Vogler despite being asked to do so. Vogler did make reasonable efforts to provide copies of service plans and other pertinent information to Mother through email, text messages, telephone calls, and even by mail. We agree that at times her efforts should have been more vigorous, although we note that her efforts included copying Mother's attorney on emails. We find it concerning that Vogler admittedly changed her telephone number and did not provide a new contact number for a short period of time. However, it is clear from the evidence that Mother was made aware of the goals in her service plans during the entire relevant time periods.

¶ 59    It is also clear from the evidence that while Mother engaged in many of the required services, she still failed to acknowledge that the children had been abused or to recognize the trauma they suffered as a result. As the circuit court expressly found, her refusal to make any changes to protect the children made it impossible for the court to return them to her custody any time soon. See *In re L.L.S.*, 218 Ill. App. 3d at 461. For these reasons, we conclude that the

evidence supports the circuit court's finding that Mother failed to make reasonable progress toward the return of her children.

¶ 60                               III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the judgment of the circuit court.


¶ 62    Affirmed.